UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                             CASE NO.: 2:21-cr-70-SPC-KCD

SHABORN WASHINGTON
_____

**ORDER**[1]

Before the Court is Defendant Shaborn Washington's Motion to Suppress Evidence; Memorandum of Points and Authorities (Doc. 20), along with the Government's opposition (Doc. 32). The Court held an evidentiary hearing on the Motion, at which time Defendant was present and represented by counsel. The Court reserved ruling at the hearing and now denies Defendant's motion.

**BACKGROUND**

At the hearing, the Government called former Deputy Jonathan Roedding of the Lee County Sheriff's Office. Defendant offered no witnesses. The Court makes these findings of fact based on the record, the parties' papers, and the admitted exhibits.

On January 16, 2021, at about 2:10 a.m., an employee of Domino's Pizza (near the intersection of Ben Hill Griffin Parkway and Corkscrew Road, Estero,

---

[1] Disclaimer: Papers hyperlinked to CM/ECF may be subject to PACER fees. By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or their services or products, nor does it have any agreements with them. The Court is not responsible for a hyperlink's functionality, and a failed hyperlink does not affect this Order.

Florida) called 911 to report suspected gunshots. (Gov. Ex. 1, 2, 3a). The employee identified herself by name and stated there was "someone outside screaming 'help.'" (Gov. Ex. 1). She said she was at the intersection of "Stoneybrook [Golf Boulevard] and Ben Hill Griffin [Parkway]" and was "heading towards Wells Fargo" trying to follow the screaming voice. (Gov. Ex. 1). She reported that "we hear gunshots." (Gov. Ex. 1). Someone in the background of the call said "it might have been [gunshots]." (Gov. Ex. 1). The caller stated she was "deaf" and was "going off what [her] employees are saying to [her]." (Gov. Ex. 1). The caller told the dispatcher "[my employees are] not sure if it was an exact gunshot." (Gov. Ex. 1). The voices in the background of the call estimated "quite a few" shots were fired. (Gov. Ex. 1). After conferring with another in her party, the caller relayed that the shots were coming from "Miromar Outlets, somewhere over there where Wells Fargo and Miromar Outlets is." (Gov. Ex. 1). The caller reported "quite a bit of cars were racing out of that area." (Gov. Ex. 1). The caller was unable to provide a suspect vehicle description.

Roedding responded to the dispatch and obtained information from both the dispatcher and the CAD accessible on his laptop. The CAD reported the address of the incident to be the intersection of "Ben Hill Griffin Pkwy & Corkscrew Rd." (Gov. Ex. 2). The CAD informed Roedding that "compl adv she hears people yelling help and poss sig 44 shots," that there were at least

ten gunshots, and that "compl hears cars squealing away from loc." (Gov. Ex. 2). The CAD specified "shots coming from: Miromar Outlets / Wells Fargo." (Gov. Ex. 2).

Roedding arrived at Wells Fargo within four to five minutes. He did not engage his emergency lights or siren on his way to the call. At the time of his arrival, both the Wells Fargo and nearby Shell gas station (whose parking lots are connected) were closed. He cruised into the area of the Wells Fargo with only his parking lights on.

Roedding spotted a vehicle parked in the Wells Fargo parking lot perpendicular to the designated parking spots. It was not near the ATM. Roedding turned his headlights on and drove towards the vehicle. In response, the car drove away without its headlights on. The car drove slowly, braking, heading toward the exit of the parking lot. It drove that way—headlights off and braking—for about 30 to 40 yards. Roedding then engaged his lights and sirens. He observed the vehicle rocking back and forth and "furtive movements" within the car. When the car stopped, Roedding approached and saw the back passenger trying to shove something underneath the backseat. He ordered the occupants to roll their windows down at which time he immediately smelled the odor of burnt marijuana. Roedding identified the backseat passenger as Defendant Shaborn Washington and located a bag

containing a firearm underneath the backseat.  A second officer seized another firearm from underneath the front passenger's seat.

Defendant was indicted by a federal grand jury in August 2021 on violations of 18 U.S.C. §922(g)(1) and 18 U.S.C. §924(e).

## DISCUSSION

Defendant argues that Roedding did not have reasonable suspicion to initiate a *Terry*[2] stop of the car Defendant occupied and that all evidence obtained from that stop should be suppressed.  The Government responds that the stop was supported by reasonable suspicion and was also supported by probable cause because the driver of the vehicle committed a traffic violation by driving through the Wells Fargo parking lot without headlights on.[3]  The Court will analyze the facts under both theories.

### A. Reasonable Suspicion

Law enforcement may conduct investigatory stops when two conditions are met: "(1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop was reasonably related in scope to the circumstances."  *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

---

[2] *Terry v. Ohio*, 392 U.S. 1 (1968).

[3] The Government's response to Defendant's motion (Doc. 32) also addresses probable cause to search the vehicle based on the odor of marijuana.  Defendant has not contested the lawfulness of the search of particular areas of the vehicle or argued that the stop was unduly prolonged.  Accordingly, the Court's analysis is limited to the lawfulness of the *Terry* stop.

The "reasonable suspicion" standard required for a lawful *Terry* stop falls below a preponderance of the evidence. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).[4] Courts assessing reasonable suspicion must consider the totality of the circumstances, exercising "commonsense judgments and inferences about human behavior." *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) (citing *Wardlow*, 528 U.S. at 123). Reasonable suspicion depends on both "the content of information possessed by police and its degree of reliability." *Navarette v. California*, 572 U.S. 393, 397 (2014). The assessment is not based on the subjective view of the officer, but whether reasonable suspicion objectively existed at the time of the stop. *Nunez*, 455 F.3d at 1226.

Not every stop is a seizure subject to the Fourth Amendment's protection against unreasonable searches and seizures. *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003). A stop only becomes a seizure when an officer restrains [a person's] freedom to walk away." *Id.* The line between a consensual interaction with law enforcement and a seizure is whether "a reasonable person would . . . feel free to terminate the encounter." *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011).

---

[4] *See also Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause").

Roedding initiated a *Terry* stop of the car in which Defendant was riding when he engaged his emergency lights and siren.[5]   Reasonable suspicion existed at the time of the stop.  Roedding received a dispatch that shots were fired specifically near the Wells Fargo around Ben Hill Griffin Parkway and Corkscrew Road.  The 911 call that resulted in the dispatch had several indicia of reliability—the report was made via use of the 911 emergency system,[6] the caller identified herself and provided a call back phone number, the caller provided a contemporaneous report[7] that was corroborated by other individuals in the background of the call, and the caller provided details about the incident (such as screaming and cars "squealing out" of the area).

Upon arriving at Wells Fargo—a location specifically identified by the 911 caller as the likely origin of the gunshots—Roedding spotted a car in the parking lot.  The car was parked perpendicular to the marked parking spaces and did not have an obvious purpose for being stopped there —it was not marked as a cleaning van, and it was not near the ATM.  At this late hour, both the Wells Fargo and nearby Shell station and outlets were closed.  The car was running but did not have headlights on.  And when Roedding shone

---

[5] The "furtive movements" in the vehicle occurred after the *Terry* stop had begun, so the Court need not consider this fact in its reasonable suspicion analysis.

[6] *See Navarette v. California*, 572 U.S. 393, 400 (2014) (discussing the use of the 911 emergency system as an "indicator of veracity").

[7] *See Navarette*, 572 U.S. at 399-400 (discussing the reliability of contemporaneous reports).

his headlights on the vehicle, the driver drove away, inexplicably driving at about five miles per hour and riding the brakes.

These circumstances present a reasonable, particularized, and objective basis for suspecting criminal activity was afoot.  First, the report of shots fired at 0210 in a commercial area is enough to believe that a crime had been committed or was being committed.[8]  Second, "commonsense judgment" says that an idle vehicle parked in the area of shots fired at 2:10 a.m. with no obvious explanation is somewhat suspicious.[9]  And finally, "commonsense judgments and inferences about human behavior" say that when that same vehicle drives away after spotting law enforcement, there is reasonable suspicion to believe that the occupants of the vehicle are involved in criminal activity.  The car drove away from Roedding specifically when he made his presence known by turning on his marked vehicle's headlights.  That the vehicle drove slowly does not detract from the flight's contribution to reasonable suspicion.  *See United States v. Gordon*, 231 F.3d 750, 757 (11th Cir. 2000) (rejecting that only "headlong flight" can justify a *Terry* stop and stating that while "the speed of the suspect's movements may be relevant . . .

---

[8] *See United States v. Jones*, 752 Fed App'x 810, 813 (11th Cir. 2018) ("Officer Pinto may have reasonably inferred from the location and the time of night that the reported gunshots warranted further investigation because they were likely related to the commission of a crime").

[9] *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) ("[A]n individual's proximity to illegal activity may also be considered [in the totality of the circumstances reasonable suspicion analysis]").

the fact that the suspect walked very quickly, as opposed to ran, away from the spot where he was sighted by police does not itself change the analysis where it is evident from the circumstances that he was attempting to flee upon sighting the police").[10]   The totality of the circumstances—that there was in an idle car, at 0210, surrounded by closed businesses, at the location of shots fired, and that car fled upon law enforcement's arrival—provides reasonable suspicion for a *Terry* stop of the vehicle.

### B. Probable Cause

Even if the Court were to find no reasonable suspicion, the Government alternatively argues that Roedding had probable cause to stop the vehicle because of a traffic infraction.   A lawful traffic stop requires either reasonable suspicion of criminal activity or probable cause to believe a traffic infraction occurred.   *United States v. Wilson*, 662 F. App'x 693, 694 (11th Cir. 2016). "Even minor traffic violations qualify as criminal activity." *Campbell*, 26 F.4th 860, 880 (11th Cir. 2002) (en banc).   Like reasonable suspicion, probable cause is viewed from the perspective of an "objectively reasonable police officer"

---

[10] *See also United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (considering a person's "walking quickly" away from law enforcement as being analogous to "flight" when assessing reasonable suspicion); *Illinois v. Wardlow*, 528 U.S. 119 (2000) ("Unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning").

regardless of the officer's subjective intent.  *United States v. Wilson*, 662 F. App'x 693, 694 (11th Cir. 2016).

Roedding testified that he was unaware of any violation of Florida law "for not having headlights illuminated in a parking lot."  Even so, Florida State Statute (Fla. Stat.) § 316.217 requires the use of "lighted lamps and illuminating devices" for "every vehicle operated upon a highway in this state" from "sunset to sunrise," excepting parked vehicles and some law enforcement vehicles.  The timeframe in the early morning hours during which the stop occurred indisputably falls between "sunset to sunrise."

Defendant contends that the driver of the vehicle was not in violation Fla. Stat. §316.217 because the term "highway" does not include the parking lot of Wells Fargo.  Defendant also contends that the Court cannot consider the violation of Fla. Stat. § 316.217 because the Government did not present evidence about whether the Wells Fargo parking lot is "public" under the statute.  Fla. Stat. § 316.003(87)(a), which supplies the definitions for Fla. Stat. § 316.217, defines a "highway" as "[t]he entire width between the boundary lines of *every way or place of whatever nature when any part thereof is open to the use of the public for purposes of vehicular traffic*" (emphasis added).  The text facially indicates that the parking lot fits the definition of a public highway

subject to traffic jurisdiction by local law enforcement;[11] no other evidence is required.  Roedding may have been unaware of Fla. Stat. § 316.217, but an objectively reasonable officer would have probable cause to believe that the car—which drove 30-40 yards through a public parking lot at 2:10 a.m. without headlights in violation of Fla. Stat. § 316.217—committed a traffic infraction. The Court thus finds Roedding had probable cause to stop the car for the infraction.

Accordingly, it is

**ORDERED:**

Defendant Shaborn Washington's Motion to Suppress Evidence; Memorandum of Points and Authorities (Doc. 20) is **DENIED**.

**DONE AND ORDERED** in Fort Myers, Florida on November 29, 2022.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: Counsel of Record

---

[11] *Compare* Fla. Stat. §316.003(87)(a), which defines "highway" as ""[t]he entire width between the boundary lines of every way or place of whatever nature when any part thereof is open to the use of the public for purposes of vehicular traffic" *with* Fla. Stat. §316.003(87)(b), which defines a "private" highway—which requires a written agreement concerning traffic control jurisdiction—as "[t]he entire width between the boundary lines of any privately owned way or place used for vehicular travel by the owner and those having express or implied permission from the owner, but not by other persons, or any limited access road owned or controlled by a special district, whenever, by written agreement entered into under s. 316.006(2)(b) or (3)(b), a county or municipality exercises traffic control jurisdiction over said way or place." *See also* Fla. Stat. §316.003(64), which similarly defines a "private road or driveway" as "any privately owned way or place used for vehicular travel by the owner and those having express or implied permission from the owner, but not by other persons."